**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**In Admiralty**

**Case No.: 1:20-cv-22518-FAM**

LEOPARD 34 M, LLC,

      Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

      Defendant.               /

**DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT**

## <u>Table of Contents</u>

**Table of Authorities** ...................................................................................................... **iii**

**1.    Introduction** ...................................................................................................... **1**

**2.    Summary Judgment Standard** ........................................................................ **3**

**3.    Choice of Law** ................................................................................................... **4**

**4.    The Loss** ............................................................................................................. **6**

**5.    Gradual or Sudden Loss Exclusion** ............................................................... **7**

**6.    The Captain Warranty** ................................................................................... **10**

    6.1.    Leopard Did Not Have a Full-Time Captain at the Time of the Loss. ........................... 11

    6.2.    Even If Captain Andrade Was the Full-Time Captain, Leopard Failed to Notify National Union of the Change. ...................................................................... 14

    6.3.    Even If Captain Andrade Were the Full-Time Captain, He Was Not Operating the Vessel at the Time of the Loss. ...................................................................... 15

**7.    Conclusion** ...................................................................................................... **15**

## Table of Authorities

**Cases**

*Bonner v. City of Prichard, Ala.*,
   661 F.2d 1206 (11th Cir. 1981) ................................................................................... 4

*Bottitta v. Bottitta*,
   598 N.Y.S.2d 304 (N.Y. App. Div. 1993) .................................................................... 8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................... 3

*Cent. Nat'l Bank v. Palmer*,
   806 F. Supp. 253 (M.D. Fla. 1992) .............................................................................. 3

*Chapman v. Am. Cyanamid Co.*,
   861 F.2d 1515 (11th Cir. 1988) ................................................................................... 3

*Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*,
   190 F.3d 26 (2d Cir. 1999) ........................................................................................ 11

*Cooper v. Meridian Yachts, Ltd.*,
   575 F.3d 1151 (11th Cir. 2009) ................................................................................... 4

*Dominick v. Dixie Nat'l Life Ins. Co.*,
   809 F.2d 1559 (11th Cir. 1987) ................................................................................... 4

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
   830 F.3d 1242 (11th Cir. 2016) ................................................................................... 4

*Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*,
   585 F.3d 236 (5th Cir. 2009) ....................................................................................... 5

*Great Lakes Reinsurance (UK), PLC v. Rosin*,
   757 F. Supp. 2d 1244 (S.D. Fla. 2010) ................................................................. 5, 11

*Hairston v. Gainesville Sun Publ'g Co.*,
   9 F.3d 913 (11th Cir. 1993) ..................................................................................... 3, 4

*Hansard v. Fed. Ins. Co.*,
   46 N.Y.S.3d 163 (N.Y. App. Div. 2017) ..................................................................... 8

*Howard v. BP Oil Co., Inc.*,
   32 F.3d 520 (11th Cir. 1994) ....................................................................................... 3

*Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.*,
   82 N.E.2d 577 (N.Y. 1948) ....................................................................................... 11

*Lachs v. Fid. & Cas. Co. of N.Y.*,
 118 N.E.2d 555 (N.Y. 1954) ...................................................................................... 8

*Maven Techs., LLC v. Vasile*,
 46 N.Y.S.3d 720 (N.Y. App. Div. 2017)................................................................... 15

*MDW Enters., Inc. v. CNA Ins. Co.*,
 772 N.Y.S.2d 79 (N.Y. App. Div. 2004)................................................................... 8

*Memmo v. Direct Supply of Wisc., Inc.*,
 No. 8:18-cv-879-JSM-JSS, 2018 WL 8244846 (M.D. Fla. July 6, 2018) ................ 5

*Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*,
 702 F.3d 118 (2d Cir. 2012)....................................................................................... 9

*Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
 679 N.E.2d 1044 (N.Y. 1997) .................................................................................... 9

*Nunez v. Superior Oil Co.*,
 572 F.2d 1119 (5th Cir. 1978).................................................................................... 4

*Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Policy No. 187581*,
 No. 20-CV-60520-RUIZ/STRAUSS, 2021 WL 1348435 (S.D. Fla. Feb. 5, 2021) ................ 14

*Sierra Club, Inc. v. Leavitt*,
 488 F.3d 904 (11th Cir. 2007).................................................................................... 3

*St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*,
 561 F.3d 1181 (11th Cir. 2009).................................................................................. 4

*St. Paul Fire & Marine Ins. Co. v. Matrix Posh, LLC*,
 No. 10-CV-4776 (SJF)(WDW), 2011 WL 13377651 (E.D.N.Y. Nov. 22, 2011) ................... 15

*Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters, LLC*,
 396 F. Supp. 3d 1170 (S.D. Fla. 2019)............................................................... 11, 13

*Useden v. Acker*,
 947 F.2d 1563 (11th Cir. 1991).................................................................................. 4

*Warrior Tomigbee Transp. Co. v. M/V Nan Fung*,
 695 F.2d 1294 (11th Cir. 1983).................................................................................. 3

## **Statutes**

§ 370.101(22), Fla. Stat............................................................................................ 10

§ 627.409(2), Fla. Stat.............................................................................................. 13

## **Rules**

Fed. R. Civ. P. 56 .................................................................................................................. 1, 3

Fed. R. Civ. P. 9(h) ............................................................................................................... 4

S.D. Fla. L.R. 56.1 ................................................................................................................ 1

Defendant, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA ("National Union"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, hereby files its Motion for Final Summary Judgment, and for the reasons stated herein, respectfully submit that Summary Judgment must be granted in its favor:

1. **<u>Introduction</u>**

This case presents an insurance coverage dispute arising out of a loss sustained by the Plaintiff's vessel, a 2008 112' Arno Leopard, M/Y ASASKA (the "Vessel"). The Vessel allegedly suffered damage when its starboard engine overheated during a trip from South Florida to the Bahamas on June 19, 2019. National Union has denied coverage.

In its investigation into the loss, National Union discovered that the overheat was caused by extensive marine growth in the Vessel's starboard heat exchanger. That this growth caused the loss has been admitted by: (1) Javier Rodriguez, whom the Plaintiff hired to clean the heat exchangers following the loss; (2) Ricky Machin, the first mate aboard the Vessel at the time of the loss; and (3) Albert Maury, the beneficial owner of the Vessel and the insured's corporate representative. Their reasoning is obvious to even the most casual observer. When the heat exchanger was disassembled following this loss, this is what they found. SOF ¶ 33.[1]

---

[1] References to National Union's contemporaneously filed Statement of Material Facts are denoted SOF followed by the corresponding paragraph number.



In short, there is no serious dispute as to why this loss occurred. Unfortunately for the Plaintiff, the Policy expressly excludes "loss, damage, claim or expense caused directly or indirectly, in whole or in part by…marine life[.]"

Aside from the fact that the loss was expressly excluded from coverage, at the time of the loss, the Plaintiff was also in violation of the Policy's captain warranty insofar as (1) the Plaintiff did not employ a full-time captain at the time of the loss; (2) even if the Plaintiff did have a full-time captain, it had not notified National Union of the change in captain; and (3) even if the Plaintiff did have a full-time captain, he was not operating the Vessel at the time of the loss. Because, under controlling law, violation of an express warranty in a marine insurance contract suspends coverage during the period of non-compliance, and because the Plaintiff was non-compliant at the time of the loss, such violation provides a separate basis for no finding no coverage.

In short, there are two wholly distinct bases for finding that the subject loss is not covered. For that reason, the Court should enter summary judgment in National Union's favor and dismiss this case with prejudice.

### 2. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007); *see also* Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988) (omission in original) (citations omitted).

The movant bears the burden of demonstrating there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993); *Warrior Tomigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir. 1994).

Construction of an insurance policy may be a question of law and suitable for summary judgment. *Cent. Nat'l Bank v. Palmer*, 806 F. Supp. 253, 256 (M.D. Fla. 1992). When deciding a motion for summary judgment, "[i]t is not part of the court's function…to decide issues of material fact, but rather [it is to] determine whether such issues exist to be tried." *Hairston*, 9 F.3d at 919.

The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Id.* at 921; *Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir. 1987).

Because the Plaintiff filed this action in admiralty and made an election under Fed. R. Civ. P. 9(h) to proceed in admiralty, this Court has already recognized that any issue of fact in this matter as between the Parties will be tried to the bench, not a jury. *See* Order Granting Motion to Strike [ECF No. 37]; *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1186-89 (11th Cir. 2009). In bench trial cases, the district judge has greater discretion to grant summary judgment, and may be "warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably, or, as is the case here, that delay under the circumstances proved is justified or unjustified, even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.'" *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).[2] As the old Fifth Circuit explained, "The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial." *Id.* After the split in 1981, the Eleventh Circuit approved this approach. *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citing *Useden v. Acker*, 947 F.2d 1563, 1572-73 (11th Cir. 1991)).

3. **Choice of Law**

As noted above, this action was filed in admiralty. Consequently, federal maritime choice-of-law rules apply. *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1161-62 (11th Cir. 2009). Under federal maritime choice-of-law rules, an express choice-of-law clause in a marine insurance contract will be enforced unless the pre-selected state has no substantial relationship to the parties

---

[2] Fifth Circuit opinions handed down prior to close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

or the transaction or the state's law conflicts with the fundamental purpose of maritime law. *Great Lakes Reinsurance (UK), PLC v. Rosin*, 757 F. Supp. 2d 1244, 1250-51 (S.D. Fla. 2010). In other words, a "choice of law provision in a maritime insurance contract will be upheld in the absence of evidence that its enforcement would be unreasonable or unjust." *Id.* at 1251 (quoting *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009)).

The Policy at issue contains a choice-of-law clause. That clause states that "Any dispute regarding the coverage afforded under the **Policy** shall be governed by the rules and principles of federal admiralty law. In the event that a rule of federal admiralty law does not exist, then any dispute regarding the coverage afforded under the **Policy** shall be governed by the law of the State of New York, without giving effect to any conflict of laws principles which might cause the application of the law of any other state or jurisdiction." SOF ¶ 6.

This clause is enforceable. To start, "parties to a marine insurance policy, which can be governed by admiralty law, can certainly contract for the application of federal maritime law." *Rosin*, 757 F. Supp. 2d at 1251. As for the secondary selection of New York law in the absence of entrenched federal maritime law, that too must be enforced. National Union is a Pennsylvania corporation with its principal place of business in New York City. SOF ¶ 7.[3] Similar forum selection clauses have been held enforceable in far more attenuated cases than where one of the parties is actually domiciled in the pre-selected forum. *See Rosin*, 757 F. Supp. 2d at 1251 (noting that a similar selection of New York law was enforceable where the insurer "first applied to be a surplus line carrier in New York…maintains bank accounts in New York…Great Lakes accepts

---

[3] Courts in Florida regularly take judicial notice of Sunbiz filings for identifying states of incorporation and principal places of business. *See, e.g.*, *Memmo v. Direct Supply of Wisc., Inc.*, No. 8:18-cv-879-JSM-JSS, 2018 WL 8244846, at *1 (M.D. Fla. July 6, 2018). The Court is requested to do so here.

service of process through attorneys in New York…and…is a wholly-owned subsidiary of [two other entities]…the offices of both of those insurance companies are in New York.").

In short, National Union—whose principal office is in New York—has substantial connections to New York that support enforcement of the choice-of-law clause. Therefore, to the extent that a particular term of the Policy is not covered by federal maritime law, the law of New York must govern.

### 4.  **The Loss**

On June 19, 2019, the Vessel set sail from Albert Maury's home in Coral Gables for the Bahamas. SOF ¶ 8. Mr. Maury is the beneficial owner of the Vessel. SOF ¶ 9. At the time, the Vessel was being captained by Jose Caballero, who was hired to operate the Vessel solely for the subject trip. SOF ¶ 10. He was not the full-time captain of the Vessel. SOF ¶ 11. Also aboard the Vessel at the time was its mate, Ricky Machin. SOF ¶ 12.

Approximately 30 minutes after departing from Coral Gables, Captain Caballero noticed that the Vessel's starboard engine was running hotter than normal. SOF ¶ 13. Captain Caballero then stopped the engines and asked Ricky Machin to check the fluid in the starboard engine's heat exchanger. SOF ¶ 14. After Machin reported that the fluid was low, Caballero instructed him to add fluid to the heat exchanger. SOF ¶ 15. Caballero then restarted the engines, and the Vessel continued on its way. SOF ¶ 16.

Approximately two hours later, Captain Caballero again noticed that the Vessel's starboard engine was running hotter than normal. SOF ¶ 17. After Ricky Machin reported that the fluid in the starboard heat exchanger was low again, Caballero again instructed him to add fluid to it. SOF ¶ 18. At this point, Caballero believed there might be a problem, but they nonetheless continued on. SOF ¶ 19.

6

Approximately another 60-90 minutes later, the Vessel overheated a third and final time. SOF ¶ 20. This time, the Vessel's fire alarm went off and the engine room sealed itself to block any oxygen from entering the engine room. SOF ¶ 21. There was no actual fire; rather, a hole had burned into the exhaust system, and exhaust was poured into the engine room as a result. SOF ¶ 22. At this point, Caballero and Machin shut the engines down, open the top hatch to vent the engine room, drop anchor, and call for a tow. SOF ¶ 23. Ultimately, the Vessel was retrieved and towed back to Pier 66 in Fort Lauderdale. SOF ¶ 24. The following day, it was towed back to Mr. Maury's home in Coral Gables. SOF ¶ 25.

Once the Vessel was back in Coral Gables, Leopard contacted a specialist to diagnose what had happened. SOF ¶ 26. That specialist was Javier Rodriguez of a company called Diesel Core Marine, LLC. SOF ¶ 27. When he arrived at the Vessel on June 26, Mr. Rodriguez observed that a hole had been burned in the exhaust muffler, indicating a lack of water flow through the heat exchanger. SOF ¶ 28. After conducting an inspection, Mr. Rodriguez discovered a large mass of what he described as "mussels" or "barnacles" in the heat exchanger. SOF ¶¶ 33-37.

**5. Gradual or Sudden Loss Exclusion**

There appears to be no entrenched federal rule governing the construction of the Policy's gradual or sudden loss exclusion. Therefore, New York law applies.

The Policy's Gradual or Sudden Loss exclusion reads, in its entirety, as follows:

> **Gradual or Sudden Loss**
> We do not cover any loss, damage, claim or expense caused directly or indirectly, in whole or in part by osmosis, blistering, fiberglass or surface coat blistering, rust, corrosion, except electrolytic (stray current) corrosion or oxidation, marine life, marine borers, moth or vermin, rot, fungi, mold or infestation, warping or shrinkage, change of temperature, freezing or humidity, deterioration, lack of maintenance wear and tear, marring, scratching, denting or inherent vice. No coverage is provided for mechanical breakdown and Manufacturing or Design Defects in regards to Tenders, Electronic Navigation and Communication Equipment, Personal

7

> Watercrafts or Trailers. However, coverage is provided for accidental damage resulting from zebra mussels, and muskrats, but applies only to engines, generators, and pumps that are attached to the Insured Vessel. Coverage is also provided for collision with marine mammals.

SOF ¶ 3.

Under New York law, unambiguous provisions in insurance policies are given their plain and ordinary meaning. *See, e.g.*, *Hansard v. Fed. Ins. Co.*, 46 N.Y.S.3d 163, 166 (N.Y. App. Div. 2017). To that end, policies of insurance "must be read through the eyes of the average man on the street or the average housewife who purchases it." *Lachs v. Fid. & Cas. Co. of N.Y.*, 118 N.E.2d 555, 558 (N.Y. 1954); *see also MDW Enters., Inc. v. CNA Ins. Co.*, 772 N.Y.S.2d 79, 82 (N.Y. App. Div. 2004) ("In construing an insurance contract, the tests to be applied are 'common speech' and 'the reasonable expectation and purpose of the ordinary businessman.'"). However, "A court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning." *Bottitta v. Bottitta*, 598 N.Y.S.2d 304, 306 (N.Y. App. Div. 1993).

The subject exclusion is not ambiguous. Rather, it plainly excludes from coverage "loss, damage, claim or expense caused directly or indirectly, in whole or in part by…marine life[.]" SOF ¶ 3. Put another way, if "marine life" in any way contributed to the loss, there is no coverage. It does not matter whether the marine life grew onboard the Vessel or were sucked into an intake; it does not matter if the heat exchanger was last cleaned the day before the loss or months before the loss. If these organisms caused the loss "directly or indirectly, in whole or in part," there is no coverage.

Here, there is no serious doubt that the loss was caused by the buildup of oysters in the Vessel's starboard heat exchanger.[4] As testified to by Javier Rodriguez, the owner of Diesel Core Marine, the company retained by the Plaintiff to clean the heat exchanger, there are only two ways for this type of overheat to occur—either a valve must have been closed or there must have been an obstruction in the intake. SOF ¶ 29. The first possibility was ruled out; if a valve were closed, the engine would have overheated immediately, which did not happen. SOF ¶ 31. And the only obstruction that was discovered in the heat exchanger following the loss was the mass of oysters, which Mr. Rodriguez testified were blocking approximately 75-80% of the raw water flow. SOF ¶¶ 33-37. Everyone who has looked has said that the loss was caused by this growth—in addition to Mr. Rodriguez, Ricky Machin (the mate aboard the Vessel at the time of the loss) and Albert Maury (the vessel's beneficial owner, who was presented as a corporate representative to testify on "the cause of the loss that is the subject of this action") have also said that this was the cause of loss. SOF ¶ 39. Indeed, when the Plaintiff submitted its first notice of loss on October 9, 2019, the Acord form submitted specifically stated "Ultimately after inspection, the issue was the result of the clogged heat exchanger." SOF ¶ 40.[5]

As a result, the only way in which the gradual or sudden loss exclusion would *not* exclude coverage for this loss is if the Plaintiff can convince this Court that the various species of mussels and oysters that grew in the heat exchanger—endemic to the salty and brackish waters that make up Biscayne Bay and the surrounding waters—are not "marine life." See SOF ¶¶ 41-43. No

---

[4] There is an exception to the exclusion for "accidental damage resulting from zebra mussels." However, under New York law, while the burden is on the insurer to prove the applicability of an exclusion, the burden is on the *insured* to prove an exception to an exclusion. *See Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121-22 (2d Cir. 2012); *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 679 N.E.2d 1044, 1048-49 (N.Y. 1997). Regardless, no evidence of zebra mussels was found in the heat exchanger, which is to be expected, as zebra mussels only grow in fresh water, anyway. SOF ¶ 46.

[5] That the loss was reported to National Union so late is a separate coverage defense that National Union has asserted. However, because there is a material issue of fact as to when the loss was reported, National Union has not moved for summary judgment on that issue.

sensible definition of "marine life" could exclude the organisms found in the heat exchanger. By way of example, Florida law defines "marine fish" (which is definitionally narrower than "life") as, *inter alia*, "marine invertebrates in the classes Gastropoda, Bivalvia, and Crustacea, or the phylum Echinodermata." § 370.101(22), Fla. Stat. Isognomon, brachidontes, and mytilopsis are all in the Bivalvia class. SOF ¶ 41. And the Plaintiff's own expert, Timothy Collins, a professor in the Department of Biological Sciences at Florida International University who has studied mollusks for 37 years, has admitted that the organisms found in the heat exchanger are "life" and survive in marine habitats. SOF ¶ 47. He further concluded that the bivalves in question came aboard the Vessel as larvae and grew past the intake filter. SOF ¶¶ 44-45.

Thus, because there is no dispute that the loss was caused by the oyster buildup in the heat exchanger, and because there is no dispute that such a cause of loss is excluded, summary judgment must be entered in National Union's favor.

### 6.  The Captain Warranty

The Policy also contains a Captain Warranty. That warranty provides, in its entirety:

> It is warranted you employ a professional captain for the yacht shown on the Declarations Page of this policy. Such captain shall be employed full time to operate and maintain the insured yacht and approved by us.
>
> The insured is required to provide us (the company) with a copy of the captain's resume and current license.
>
> If there is no captain employed, or if you change captains without reasonable notice and approval by us, then there will be no coverage under this policy.
>
> All other terms, conditions and exclusions remain the same.

SOF ¶ 5. This warranty was violated in three ways. First, at the time of the loss, Leopard did not have a full-time captain; while Roger Andrade had nominally been hired, he did not commence work until nearly a month later. Second, even if Captain Andrade was the full-time captain of the

Vessel, the change in captain—and the loss—occurred before the Plaintiff notified National Union. And third, even if Andrade had been nominally hired, he was not operating the Vessel at the time of the loss.

Whether as a matter of federal maritime law or New York law, any breach of a marine insurance warranty voids coverage, irrespective of whether there is any relationship between the breach and the loss. *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters, LLC*, 396 F. Supp. 3d 1170, 1177 (S.D. Fla. 2019) (holding that under federal maritime law, all warranties are to be strictly enforced);[6] *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31-32 (2d Cir. 1999) (holding the same under New York law). An express warranty in a marine insurance policy "must be literally complied with, and…noncompliance forbids recovery, regardless of whether the omission had a causal relation to the loss." *See Jarvis Towing & Transp. Corp. v. Aetna Ins. Co.*, 82 N.E.2d 577, 577 (N.Y. 1948); *see also Rosin*, 757 F. Supp. 2d 1257-58 (discussing the impact of the breach of a marine insurance warranty under New York law).

Thus, because Leopard was in breach of the Captain Warranty at the time of the loss, there is no coverage for the loss.

### 6.1.    Leopard Did Not Have a Full-Time Captain at the Time of the Loss.

Leopard's had several captains throughout the early half of 2019. At the beginning of 2019, Roger Andrade was the Vessel's full-time captain. SOF ¶ 48. He then left the Vessel on or about February 23, 2019, and was replaced, ostensibly, by Racso Bustamante in April. SOF ¶¶ 49-50.

---

[6] Candidly, *Ocean Reef* is currently on appeal in the Eleventh Circuit (case no. 19-13690) on its holding that all marine insurance warranties are strictly applied, where it has been fully briefed, argued, and is awaiting disposition. However, even if *Ocean Reef* is overturned on those grounds, New York law still strictly enforces marine insurance warranties. Either way, violation of the warranty results in a suspension of coverage. *See Rosin*, 757 F. Supp. 2d at 1257-58 (enforcing a named operator warranty under New York law after finding that there was no entrenched federal maritime law on point).

National Union approved Mr. Bustamante as the Vessel's captain on April 22, 2019. SOF ¶ 52.[7] In fact, Racso Bustamante explicitly testified that he was *never* the full-time captain of the Vessel, SOF ¶ 51. In light of such a representation by Mr. Bustamante, it is questionable whether the Vessel even had a full-time captain between when Andrade left and when he ultimately came back after the loss.

Ultimately, however, Bustamante—whom National Union had approved as the full-time captain—was terminated as of the end of May of 2019. SOF ¶ 53. Then, at some point in early to mid-June, Mr. Maury offered Andrade the opportunity to come back as captain. SOF ¶ 54. Captain Andrade then ostensibly "started" on June 16, 2019—the first date appearing on the paystubs Leopard produced in discovery. SOF ¶ 55. The loss occurred three days later; Captain Andrade was not on board at the time. SOF ¶¶ 56-57. The captain who *was* onboard at the time, Jose Caballero, also testified that he was *not* the full-time captain of the Vessel. SOF ¶ 57.

Despite the "paper" start date, Captain Andrade could hardly have been considered the "full-time" captain on the date of the loss. Andrade went out of his way to contact National Union via email to confirm that "I was not the captain on board while the engine overheat and claim incident happened in June 2019." SOF ¶ 58. In fact, when Captain Andrade first "came back" to the Vessel shortly before the loss, he testified that "I did not run the vessel or anything like that. I just came on board. And according to the mate's information, there was a management company doing the regular maintenance, whatever they need to do, and that's all I know so far." SOF ¶ 60. He "didn't perform any particular job," but remembered only that he "came back to see the mate and say hi and see the boat." SOF ¶ 61. He also knew Leopard's owner had planned a trip to the Bahamas, but Captain Andrade could not go because he was still finishing another job on another

---

[7] There is some inconsistency in the record about when precisely Mr. Bustamante was approved by National Union, but that inconsistency is not material for purposes of summary judgment.

project and because he had a previously scheduled trip to Spain. SOF ¶ 62. He could not begin his

employment as captain of the Vessel until those two items were dealt with. SOF ¶ 63. When asked

"you did not begin your employment as captain until after you got back from Spain," in July of

2019, Captain Andrade responded "Correct." SOF ¶ 64.

A very similar factual situation was considered by the Court in *Ocean Reef.* There, the

policy's captain warranty provided that the insured "employ a professional captain…Such captain

shall be employed ***full time*** and approved by us." *Ocean Reef*, 396 F. Supp. 3d at 1177 (emphasis

original).[8] The court explained that where the subject captain was hired on a mere temporary basis

and was not even in the state of Florida during his five-day tenure, he could not seriously be

considered full-time. *Id.* As noted above, both Captain Caballero and the Vessel's owner admitted

that Captain Caballero—the captain operating the Vessel at the time of the loss—was only a

temporary captain. SOF ¶ 57. And even if Captain Andrade had *ostensibly* been hired three-days

before the loss, he was not on board at the time of the loss, was not actually engaged in the work

of a captain until July, and may not have even been in North America at the time. SOF ¶ 62.

In short, despite the fact that the first day of Captain Andrade's pay period predated the

loss (and by only 72 hours, at that), there is nothing to indicate that Captain Andrade actually *was*

the full-time captain of the Vessel at the time of the loss, including Captain Andrade's own

understanding of his role. The "mere availability to serve as a backup or assistant captain does not

show—and, if anything, negates any contention—that he was employed as a full-time captain for

the maintenance and care of the Vessel." *Serendipity at Sea, LLC v. Underwriters at Lloyd's of*

---

[8] As noted above, *Ocean Reef* is currently on appeal in the Eleventh Circuit. In *Ocean Reef*, the relevant choice-of-law analysis was between federal maritime and Florida law. *Id.* at 1174. In that case, the difference was dispositive insofar as Florida law requires that for a breach of a marine insurance warranty to provide a defense to coverage, such breach must "increase[] the hazard by any means within the control of the insured." § 627.409(2), Fla. Stat. The court's conclusion that the warranty was *breached* was not appealed. Because, in this case, the effect of the breach of warranty is the same irrespective of which law applies, *Ocean Reef* remains highly instructive irrespective of its outcome in the Eleventh Circuit.

*London Subscribing to Policy No. 187581*, No. 20-CV-60520-RUIZ/STRAUSS, 2021 WL 1348435, at *5 (S.D. Fla. Feb. 5, 2021). The fact that Andrade was in another country at the time of the loss is a further strike against any full-time status. *Id.* at n.8 ("Whatever hypothetical questions Plaintiff posits about what it means to be a "full-time" captain, it certainly does not mean being "available" as a back-up captain when the boat is in another country for over a month with you never stepping foot on it."). The Captain Warranty specifically provides that if the insured does not have a full-time captain employed, "then there will be no coverage under this policy." Because that warranty was violated, and because under either federal maritime or New York law the breach of a marine insurance warranty voids coverage irrespective of any causal relation, there is no coverage for the subject loss.

### 6.2. Even If Captain Andrade Was the Full-Time Captain, Leopard Failed to Notify National Union of the Change.

As noted above, there can be no serious contention that the Vessel had a full-time captain on June 19, 2019. But even if there were, the warranty was violated in another way. The Captain Warranty specifically provides that "if you change captains without reasonable notice and approval by us, then there will be no coverage under this policy." SOF ¶ 5. As noted above, last captain whom National Union approved prior to the loss was Racso Bustamante, whose employment terminated at the end of May of 2019. SOF ¶¶ 53, 59. Leopard admits that the next time it notified National Union of a change in captain was June 24, 2019—five days *after* the loss, when it requested that the captain be changed to Andrade. SOF ¶¶ 59, 65. It never requested that Captain Caballero be approved at all. SOF ¶ 66.[9] As such, the Captain Warranty was violated and there is no coverage.

---

[9] Strictly speaking, on June 24, Leopard only told their *agent* that the captain had changed. The agent did not refer the request to National Union until much later. But because, either way, the change request was not made until after the loss, it makes no difference.

14

**6.3.     Even If Captain Andrade Were the Full-Time Captain, He Was Not Operating the Vessel at the Time of the Loss.**

Finally, the Policy provides that the full-time captain "shall be employed full time to operate and maintain the insured yacht[.]" SOF ¶ 5. There is no dispute that, even if Captain Andrade were the full-time captain, he was not in command of the Vessel at the time of the loss. SOF ¶¶ 11, 57-58. Nor is there any dispute that Captain Caballero-who *was*—in command of the Vessel, had not been approved. SOF ¶¶ 11, 66.

Under general principles of contract interpretation under New York law, effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms. *Maven Techs., LLC v. Vasile*, 46 N.Y.S.3d 720, 722 (N.Y. App. Div. 2017). The Policy requires—not just that the insured hire a full-time captain—but that the insured hire a full-time captain "to operate" the vessel. SOF ¶ 5; *cf. St. Paul Fire & Marine Ins. Co. v. Matrix Posh, LLC*, No. 10-CV-4776 (SJF)(WDW), 2011 WL 13377651, at *6 (E.D.N.Y. Nov. 22, 2011) (holding that a warranty providing only that an insured "employ a professional captain" and that such captain be employed "full time" did not mean that *only* the captain could operate the vessel). In context, the only reasonable construction of the word "to" in the warranty is "for the purpose of." Allowing the insured to have someone other than the full-time captain operate the vessel would read the requirement that a full-time captain be "employed full time to operate…the insured yacht and approved by us" right out of the Policy.  It would allow the insured to change the identity of the captain on a whim; the insurer would have essentially no idea who was operating an extremely valuable piece of heavy machinery. Such a construction would be patently unreasonable. As such, because the insured breached the warranty by having someone other than the approved captain operating the Vessel at the time of the loss, there is no coverage.

**7.  <u>Conclusion</u>**

For the reasons discussed above, there is no coverage for this loss. The loss was caused by the substantial build-up of oysters in the starboard heat exchanger, which reduced the raw-water flow through the heat exchanger by as much as 80%. No other cause of loss has been identified, and the Plaintiff's own corporate representative has affirmed that this marine life was the cause of the loss. Because the Policy expressly excludes "loss, damage, claim or expense caused directly or indirectly, in whole or in part by…marine life," there is no coverage.

Secondly, the Policy's Captain Warranty required both that a full-time captain be employed to maintain and operate the Vessel, and that changes in captain must be approved by National Union. At the time of the loss, the Vessel had no full-time captain. But even if it did, the change was not reported to National Union until after the loss. Either violation voided coverage, and there is no coverage for the loss.

WHEREFORE, National Union respectfully requests that this Court grant its Motion for Summary Judgment, dismiss the Plaintiff's case with prejudice, and grant any further relief the Court deems just and appropriate.

Dated: April 19, 2021.

Respectfully submitted,

**DAVANT LAW, P.A.**
*Attorneys for National Union*
12 Southeast 7th Street, Suite 605
Fort Lauderdale, FL 33301
Telephone: (954) 414-0400

By: */s/Aaron M. Dmiszewicki*
Charles S. Davant
Florida Bar No. 15178
csd@davantlaw.com
Aaron M. Dmiszewicki
Florida Bar No. 111455
amd@davantlaw.com

16